# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| John D. Trowbridge,<br><br>                Plaintiff,<br>    v.<br><br>Nancy A. Berryhill,<br>Acting Commissioner of<br>Social Security,<br><br>                Defendant. | No. 3:18-cv-01578<br><br>(Judge Jones) |

## MEMORANDUM

## May 1, 2019

## I.     Procedural Background.

We consider here the appeal of Plaintiff John Trowbridge from an adverse decision of the Social Security Administration ("SSA" or "Agency") on his applications for disability insurance benefits and supplemental security income benefits. Plaintiff's claim was initially denied at the administrative level on October 29, 2014. Plaintiff then requested a hearing before an administrative law judge (ALJ) and received a hearing on January 24, 2017 in Harrisburg, Pennsylvania. On June 5, 2017, ALJ Susan L. Torres issued a written decision that denied both of Plaintiff's applications. Plaintiff then requested review from the Appeals Council but was unsuccessful. The Appeals Council's denial of Plaintiff's

request for review dated June 4, 2018 is a final decision of the Agency that vests

this Court with jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## II. Testimony before the ALJ.

At the hearing of January 24, 2017 Plaintiff testified. He was represented by

Attorney Stephen Hogg. Also testifying were Jamie Weirich, Plaintiff's wife, and

Nancy Horner, a vocational expert ("VE"). The testimony may be summarized as

follows:

### a. Plaintiff's Testimony.

Plaintiff testified that he last worked in 2012. He has been living with his

wife, who is employed, since 2012. Plaintiff's work history includes work at a

convenience store from 2005 to 2007. There he performed such tasks as food

preparation and working a cash register. He next worked at a Friendly's Ice Cream

Restaurant from 2007 to 2009 where he unloaded trucks and worked as a

dishwasher. At some point in 2009 he stopped working at Friendly's due to surgery

on his left knee. Later in 2009 he began to work at Circle Corporation, a Hershey

Restaurant. He then worked for Gilligan's Restaurant as a dish washer and "prep

person" in 2012. The job at Gilligan's Restaurant was his last gainful employment.

The heaviest items he had to lift at any of his jobs weighed forty to fifty pounds.

He would have to do this type of lifting twice weekly while employed at

Friendly's. (R. 40-44).

Plaintiff has a GED and was formally schooled through tenth grade. His high school curriculum consisted of general classes. He has never had a driver's license. When he was sixteen years of age he was ineligible to get a driver's license because of "troubles with the law" and he never pursued a license since then. He is currently thinking of applying for a driver's license. He stated that his problem with anxiety has nothing to do with his ability to drive. (R. 45-46).

Dr. Patel was his treating physician from 2014 through 2016. Plaintiff was seeing Dr. Patel due to severe pain in his left knee. He has had two surgeries on his left knee, one in 2001 and one in 2009. The first surgery involved repair of damaged ligaments and the second surgery involved insertion of a plate held in place by screws to address a bone on bone situation. He has been informed that he will need a knee replacement "down the road". (R. 47-48).

Plaintiff's right leg is also damaged. In 2001 his right shin was shattered in an accident. He has chronic pain in his right leg as a result. The pain in his right leg impairs his ability to stand. He can stand for no more that one half hour before the pain forces him to sit down. He estimates that he can walk about three blocks before "it starts to take a toll on my legs." His left knee and right leg problems hamper his ability to lift and he estimates that he cannot comfortably lift objects over twenty pounds. His ability to lift has deteriorated since he worked at

Friendly's due to his leg and knee problems and the onset of arthritis in his left knee. (R. 48-49).

Plaintiff's leg and knee pain make it necessary for him to sit in a recliner with his legs elevated much of the day. Sitting in that position eases his leg pain. He has been sitting in a recliner as much as eight hours each day since the end of 2014. Plaintiff stated that just sitting in a chair would ease his leg pain but elevating the leg helps much more. He estimated that if he were working he would miss three to four days per month due to the stress on his left knee and right leg. Two or three times each day the pain becomes bad enough to interfere with his ability to concentrate. When the pain intensifies to that extent he takes Aleve to get some relief. (R. 49-52).

Plaintiff also described episodes of anxiety. These episodes come on for no apparent reason and are characterized by chest tightness, dizziness, feeling faint, and panic symptoms. He experiences these episodes two to three times per week but, on occasion, has had multiple episodes in one day. He finds it helpful if someone else is present during one of these episodes because he or she can talk to him and help him calm down. Placing his head in a brown paper bag and breathing heavily can be helpful in ending one of these panic attacks. He thinks that his ability to concentrate is badly impaired during an anxiety attack and he does not

believe he could continue working during one. He is not on any medications for anxiety and Dr. Patel has not recommended any. (R. 53-56).

He has not seen Dr. Patel for about a year due to lack of insurance. His wife recently reacquired insurance and he plans to begin treating again. He has not had physical therapy for his legs but he tries to exercise at home to strengthen them. He has had alcohol and substance abuse issues in the past. Currently he has cut back on his drinking significantly and is not taking any drugs at all. (R. 57-58).

Because his wife works he does most of the household chores including cleaning, cooking, laundry, and cutting the lawn on a riding mover. When he is not doing chores he is sitting in his recliner. He does the chores in fifteen to twenty minute segments with intervals of rest in the recliner in between. He estimates that he spends a total of about two hours each day doing chores. (R. 58-61).

**b. Testimony of Jamie Weirich.**

Jamie Weirich is Plaintiff's wife of four years. She runs a property management company and is typically out of the home from 10:00 a.m. to 6:00 p.m. during the work week. She states that her husband has not worked at all during their marriage and verified that he stays home and does household chores. She also corroborated Plaintiff's testimony that he must take frequent breaks while doing chores because his knees bother him and, at times, swell so much that he must sit down and elevate them. He often trips while using the four steps that lead

into their house. He trips because his knee just gives out. This happens two to three times per week. (R. 62-64).

Plaintiff's wife stated that they had no health insurance in 2015 or 2016 but that they had reacquired coverage at the beginning of 2017. Her husband did not go to the doctor often in the preceding two years because of their lack of insurance and because he dislikes taking medicine or going to doctors. She intends to make an appointment with a knee specialist for Plaintiff and expects to get a referral from Dr. Patel. She observes his anxiety and panic symptoms virtually every day and these manifest themselves as much as three or four times daily. Such things as people stopping by or an upsetting television program can trigger his anxiety attacks. These attacks last for up to an hour. She tries to help him through them by talking to him and rubbing his head to help him relax. He has seen a therapist named William Thomas twice since they regained insurance coverage. Mr. Thomas wants him to see a doctor to get a prescription for an anxiety medication. (R. 64-66).

Plaintiff's wife also stated that her husband rarely gets uninterrupted sleep and that he more normally wakes up grabbing his chest, kicking, and punching. He is very agitated when he awakes and it takes a while to calm him down and get him back to sleep. Two hours later the same thing will happen again. She thinks he may have sleep apnea and wants him to be tested for that. He sleeps in the recliner. She

states that he is in the recliner day and night. Plaintiff's knee swells about twice each week and needs to be wrapped with an ace bandage. When the knee swells he cannot do any chores at all until the swelling subsides. (R. 66-68).

### c. Testimony of the vocational expert.

Vocational expert Nancy Horton also testified. She stated that she was familiar with Plaintiff's work history and that his past relevant work was as a kitchen helper (a medium exertional level job) and as a fast food worker (a light exertional level job). The ALJ asked Ms. Horton a hypothetical question in which she was asked to assume: "an individual of the same age, education and work experience as the Claimant and with the following residual functional capacity. This person can perform light work. They can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds. They can occasionally push or pull with the left lower extremity. They must avoid concentrated exposure to hazards such as heights and moving machinery on the ground, like forklifts. They can understand, remember and carry out simple instructions in an environment free of fast paced production requirements involving only simple work-related decisions with few work place changes and they can have occasional interaction with the public." (R. at 71). Based on this hypothetical question, Ms. Horton stated that such an individual could not perform Plaintiff's past relevant work because of the lifting requirements and the need to deal with people. However, Ms. Horton

identified other jobs (e.g. laundry worker and cafeteria worker) that the

hypothetical individual could perform. Ms. Horton added that the hypothetical

individual could not perform Plaintiff's past relevant work even if that work were

to be performed at the sedentary level. However, given the hypothetical limitations

and the ability to do sedentary work, Ms. Horton stated that other jobs of the

sedentary, unskilled variety (e.g. inspector, machine operator, and assembler)

would be within the hypothetical individual's capacities. When the hypothetical

question was changed to add additional limitations requiring an unscheduled ten

minute break every hour and unscheduled absences from work three to four times

monthly, Ms. Horton indicated that these additional limitations would render the

hypothetical individual unemployable. Finally, on questioning by Plaintiff's

attorney, Ms. Horton stated that, given the limitations of the original hypothetical

question and an additional limitation such that the hypothetical individual would be

off task more that fifteen percent of the workday due to problems with

concentration and pace, that hypothetical individual would be unable to sustain any

gainful employment. (R. 69-73).

### III.   Medical Evidence.

### 1.  Dr. Viral Patel.

Dr. Patel was Plaintiff's treating physician from September of 2014 through

May of 2016. During this time Dr. Patel's progress notes reflect that he saw

Plaintiff on six occasions. On September 24, 2014, Dr. Patel's notes indicate that Plaintiff confided that he had not seen a doctor in a long time. Dr. Patel assessed knee pain bilaterally stemming from knee surgeries after a car accident in 2001. (R. 300-301).

On November 18, 2014 Dr. Patel saw Plaintiff again. At that time Plaintiff's primary complaint was chest pain. A secondary purpose of Plaintiff's visit was to have Dr. Patel complete forms related to a child support obligation. Dr. Patel ordered a chest x-ray and assessed GERD, anxiety, and bilateral knee pain for which he prescribed ibuprofen. (R. 297-299). Incident to Plaintiff's visit of November 18, 2014, Dr. Patel also completed a Residual Functional Capacity Questionnaire in which he indicated: Plaintiff's knee pain would constantly interfere with his ability to attend and concentrate; Plaintiff would need to sit down for a ten minute break every hour; Plaintiff could sit, stand, and walk for one hour at a time; Plaintiff could sit four hours and stand/walk four hours in an eight hour workday; Plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds; Plaintiff would miss work three to four times monthly as a result of his impairments; and that Plaintiff was not a malingerer. (R. 304-305).

Dr. Patel saw Plaintiff on four occasions between February 9, 2015 and May 25, 2016. On each of theses occasions Plaintiff's primary complaint was knee pain.

On May 20, 2015 Dr. Patel ordered an x-ray of Plaintiff's left knee. That x-ray, as read by Dr. Tamra L. Heimert, showed "mild to moderate arthritis of the medial knee compartment" and "no acute findings". (R. 317-329).

### 2. Greg Grabon, M.D.

Dr. Grabon, saw Plaintiff on referral from the Bureau of Disability Determination for a consultative internal medicine examination on March 23, 2017. Dr. Grabon took a medical history from Plaintiff who related that an injury in 2001 necessitated ligament repair surgery involving a plate being placed in his left knee in 2008 and caused fluid to collect in his right knee. Plaintiff also stated that he had a history of anxiety and panic attacks since 2007, depression since 2009, and sleep apnea (for which he has not had a study) since 2012. Dr. Grabon's physical examination disclosed that Plaintiff: was in no acute distress; displayed a slightly antalgic gate; could walk on heels and toes without difficulty; could perform a full squat; needed no help changing clothes for the examination; and needed no help getting on and off the examination table or rising from a chair. Plaintiff had normal deep tendon reflexes that were equal in his arms and legs, no sensory deficits, and 5/5 strength in all extremities. Dr. Grabon diagnosed: osteoarthritis of the left knee, anxiety, panic attacks, hypertension, sleep apnea, depression, GERD, and asthma. Dr. Grabon assigned Plaintiff a prognosis of "fair". (R. 336-340).

Dr. Grabon also completed a Medical Source Statement regarding Plaintiff's physical capacity to perform work-related activities. (R. 341-348). He found that Plaintiff could: frequently lift and carry up to fifty pounds; sit, stand, and walk for up to three hours at a time; sit, stand, and walk up to five hours in an eight hour workday; continuously use either hand to reach, handle, finger, feel, and push; continuously operate foot controls with either foot; never climb ladders or scaffolds; frequently climb stairs or ramps, balance, stoop, kneel, crouch, or crawl; never be exposed to unprotected heights, dust, fumes, or pulmonary irritants; and never be exposed to very loud noise levels. Dr. Grabon found that Plaintiff's limitations had lasted or would last at least twelve consecutive months. (R. 336-346).

### 3. William Thomas, Licensed Psychologist.

Dr. Thomas saw Plaintiff on January 12, 2017 on referral from Plaintiff's treating physician. He was referred for an "assessment of his neurocognitive, academic, and social/emotional adjustment and functioning for purposes of treatment planning." Dr. Thomas' clinical impressions were: borderline intellectual functioning; pervasive psychoeducational delay; alcohol dependency in remission; anxiety disorder; and antisocial personality disorder. Plaintiff was described as having tested in the "dull normal/mild intellectually impaired range of cognitive functioning." Dr. Thomas concluded his report by stating: "He has made

application for SSDI benefits and it is clinically felt that considering the extent and magnitude of his reported physical problems, compromised cognitive/academic status and his social/emotional problems that SSDI benefits be granted." (R. 331-335).

### IV. The ALJ's Decision.

The ALJ's Notice of Decision (R. 15-26) was unfavorable to the claimant and included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.

2. The claimant has not engaged in substantial gainful activity since May 31, 2014, the alleged onset date.

3. The claimant has the following severe impairments; left knee osteoarthritis, status post-surgery; borderline intellectual functioning; pervasive personality disorder; anxiety disorder; antisocial personality disorder; alcohol dependency in partial remission.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567 (b) and 416.967 (b). He can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can occasionally push or pull with his left lower extremity. He must avoid concentrated exposure to hazards such as heights and moving machinery on the ground like forklifts. The claimant can understand, remember, and carry out simple instructions in an environment free of fast-paced production requirements involving only simple work related decisions with few workplace changes. He can have occasional interaction with the public.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on November 2, 1975 and was thirty seven years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2014, through the date of this decision.

## V.    Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain:

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he is unable to engage in his past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (Doc. 10-2 at 25).

## VI.    Standard of Review.

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla".  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The United States Court of Appeals for the Third Circuit further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence–-particularly certain types of evidence (e.g., that offered by treating physicians)–-or if it really constitutes not evidence but mere conclusion.  *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear that it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, our Court of Appeals clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII.   Discussion

### A.  General Considerations.

At the outset of this Court's review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, I note that the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial; rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.    Plaintiff's Allegations of Error**.

Plaintiff asserts that the ALJ erred in three respects which require remand of this case. The Court shall consider these assertions in the order presented.

**1. Whether the ALJ erred in failing to apply the treating physician rule regarding Dr. Patel's opinion?**

Plaintiff argues that the ALJ ignored the treating physician rule in crafting his decision. Plaintiff asserts correctly that the opinion of a treating physician is generally entitled to great deference under the Agency's own rules and the case law of the Third Circuit Court of Appeals. This is more particularly true when there is a long, longitudinal record created by the treating physician that documents his treatment of the patient. *Morales v. Apfel,* 225 F. 3d 310, 317 (3d. Cir. 2000). Indeed, when a treating physician's opinion regarding the severity of a claimant's impairments "is well-support by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, we (SSA) will give it controlling weight." 20 C.F.R. § 404.1527 (c)(2). Yet, it is also true that, where competing medical evidence exists, it is within the ALJ's authority to choose which medical evidence to credit and which to reject as long as there is a rational basis for the decision. *Plummer v. Apfel,* 186 F. 3d 422 ,429 (3d Cir. 1999). The ALJ may even elevate the opinion of a non-treating, non-examining physician over that of a treating physician in an appropriate case. *Morales,* supra, at 317; See also 20 C.F.R. § 404.1527 (f)(1).

While there can be no dispute that Dr. Patel qualifies as a treating physician in this case, his opinion of November 18, 2014 (R. 304-305) was informed by only

two sessions with the Plaintiff. Thus, Dr. Patel's conclusions are not supported by the "long-longitudinal record" that undergirds the rationale for the treating physician rule. Moreover, the records of Dr. Patel's encounters with the Plaintiff do not reflect severe, disabling symptomology. As previously stated, Dr. Patel saw Plaintiff on only two occasions before expressing his opinion that Plaintiff could not sustain full-time work. On the first of these occasions (September 24, 2014) he does note knee issues related to a surgery performed in 2001. The treatment recommended was benign and consisted only of a prescription for ibuprofen and the gravity of Plaintiff's situation is hardly supported by the fact that no objective testing was ordered to more precisely determine the etiology of Plaintiff's "knee issues".

On the only other occasion (November 18, 2014) that Dr. Patel saw Plaintiff before expressing his opinion, he noted that Plaintiff "presents for domestic relations forms and chest pain." His physical exam on that date reflected that Plaintiff was in "no acute distress". While Dr. Patel ordered a chest x-ray, he still did not see fit to order diagnostic testing of any kind to determine the reason for

Plaintiff's knee pain. [2] The only treatment ordered for Plaintiff's knee pain was a renewal of Plaintiff's prescription for ibuprofen.

Given the utter lack of objective, diagnostic testing leading up to Dr. Patel's opinion and the non-existence of a "long longitudinal record" as envisioned in *Morales v. Apfel*, supra, the Court cannot fault the ALJ for declining to afford Dr. Patel's opinion controlling weight. Plaintiff's assignment of error on this point must be rejected.

## 2. Whether the ALJ erred in her evaluation of the psychological evidence?

The ALJ acknowledged that Plaintiff had severe psychological impairments in the form of pervasive personality disorder, anxiety disorder, and antisocial personality disorder. In crafting Plaintiff's residual functional capacity (RFC), the ALJ attempted to accommodate Plaintiff's impairments by limiting him to employment involving only simple instructions and decisions, an environment free of fast-paced production requirements, and only occasional interaction with the public. (R. at 20). These accommodations resulted from the ALJ's conclusion that

---

[2] The ALJ did not find that Plaintiff's chest pain constituted an impairment, Plaintiff does not complain of this omission in his brief, and there is no indication in the record that chest symptomology impairs Plaintiff's ability to work.

the claimant has only "moderate" psychological limitations. (R. at 19). Plaintiff questions whether his RFC was based on more that the ALJ's intuition.

The only mental health professional to examine Plaintiff was William Thomas, a licensed psychologist. On January 10, 2017 Dr. Thomas examined Plaintiff to access "his neurocognitive, academic, and social/emotional adjustment". (R. at 332). Dr. Thomas' clinical impressions included borderline intellectual functional, pervasive psychoeducational delays, anxiety disorder, and antisocial personality disorder. (R. at 334). Because these diagnoses appear nowhere else in the record, it is apparent that the ALJ's findings that Plaintiff had these impairments are supported solely by Dr. Thomas' assessment. Dr. Thomas also found that "considering the extent and magnitude of his reported physical problems, compromised cognitive/academic status and his social/emotional problems", Plaintiff was entitled to disability benefits. (R. at 335).

While crediting the accuracy of Dr. Thomas' diagnoses, the ALJ disagreed with the extent of their limiting effects. The question that emerges from this seeming contradiction is what medical evidence did the ALJ rely on to form his opinion that Plaintiff's social/emotional and cognitive problems were only "moderate"? The ALJ's assessment appears to be based upon: Plaintiff's testimony that he spends time with others once a week, watches movies, plays video games, and goes out shopping and to eat occasionally; Dr. Patel's observation that Plaintiff

was oriented to time and place with appropriate affect on several occasions; and her own observation that he was not taking any medication to address his "mental health impairments". (R. at 19 and 22-23).

The Court is concerned that the record is insufficiently developed to conclude whether substantial evidence supports the ALJ's RFC determination. While Dr. Thomas' conclusions regarding Plaintiff's impairments are not neatly tailored to the nomenclature ("minimal", "moderate", and "marked") that one usually sees in Social Security disability files, his conclusion clearly was that Plaintiff could not sustain employment. No other mental health professional evaluated Plaintiff and the Court is not comfortable in accepting the ALJ's evaluation of Plaintiff's mental/emotional state unsupported, as it is, by any clear medical evidence that refutes Dr. Thomas' conclusion. Accordingly, Plaintiff's allegation of error on this point must be credited.

**3. Whether the ALJ erred by failing to adequately explain his reasons for finding Plaintiff only partially credible and for not making a separate credibility finding with respect to Plaintiff's wife's testimony?**

As the government argues:

> In evaluating a claimant's subjective complaints, an ALJ weighs the claimant's statements against his medical history,

medical signs and laboratory findings, and statements by the
medical sources. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). A
claimant's description of his symptoms, standing alone, is never
enough to establish an impairment or disability. 20 C.F.R. §§
404.1529(a), 416.929(a); *Prokopick v. Commissioner of Social
Security*, 272 F. App'x. 196,199 (3d Cir. 2008). Rather, there
must be medical signs and laboratory findings that show that a
claimant has a medical impairment that could reasonably be
expected to produce the pain or other symptoms. *Id.* So long as
substantial evidence supports her conclusion, the Court should
afford "great deference" to the ALJ's evaluation of Plaintiff's
subjective complaints. *Horodenski v. Commissioner of Social
Security*, 215 F. App'x. 183-189 (3d Cir. 2007).

(Doc. 16 at 22-23).

The government also asserts accurately that diagnostic imaging indicated
only mild to moderate findings (R. at 329) and that Plaintiff functioned for years
without need of narcotic pain medications. Given the accuracy of these
observations and the contrary evidence provided by Dr. Grabon's evaluation, the
Court must conclude that substantial evidence supports the ALJ's assessment of

Plaintiff's physical capacities and we accord it the deference required by *Horodenski,* supra.

With respect to the allegation that the ALJ improperly failed to explain the weight given to Plaintiff's wife's testimony, the ALJ specifically noted that, when asked why the claimant had not returned to his doctor since May 2015, the claimant's wife explained that her husband was a hypochondriac and did not cite a complete lack of insurance. The ALJ also noted that, despite the wife's testimony regarding her husband's legs giving out on him, there was nothing in the medical record to substantiate that. While the Court does not mean to impugn Plaintiff's wife's honesty, it finds that the ALJ fulfilled her duty by obviously considering and discussing the wife's testimony. *Burnett v. Commissioner of Social Security,* 220 F.d 112,122 (3d Cir. 2000). Thus, Plaintiff's assignment of error on this point will be rejected.

## VIII. Conclusion.

For the reasons discussed above, this case will be remanded to the Commissioner for the sole purpose of further development of the record regarding Plaintiff's mental/emotional status and its impact on his RFC. This pursuit will involve seeking clarification from Dr. Thomas and/or securing an opinion from a consulting/examining psychologist or psychiatrist. An Order consistent with this determination will be filed contemporaneously.